IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SANDBOX LOGISTICS, LLC; SANDBOX ENTERPRISES, LLC; and OREN TECNOLOGIES, LLC, | § § § § | |
| Plaintiffs, | § § | Civil Action No. 3:16-cv-12 |
| v. | § § | **JURY TRIAL DEMANDED** |
| GRIT ENERGY SOLUTIONS, LLC, | § § § | |
| Defendant. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs SandBox Logistics, LLC, SandBox Enterprises, LLC, and Oren Technologies, LLC (collectively "Plaintiffs" or "SandBox") for their Complaint against Defendant Grit Energy Solutions, LLC allege as follows:

## NATURE OF THE CASE

1.      Plaintiffs bring this action for the willful infringement of two patents, U.S. Patent Nos. 8,827,118 and 8,585,341 (together "asserted patents"), under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, as well as for unfair competition and fraud arising under Texas common law.

## THE PARTIES

2.      Plaintiff SandBox Logistics, LLC ("SandBox Logistics") is a Texas limited liability company with a principal place of business at 3200 Southwest Freeway, 13th Floor, Houston, Texas 77027.  All members of SandBox Logistics, LLC reside in and are citizens of Texas.

3.      Plaintiff SandBox Enterprises, LLC ("SandBox Enterprises") is a Texas limited liability company with a principal place of business at 18515 Aldine Westfield Road, Houston, Texas 77073.  All members of SandBox Enterprises reside in and are citizens of Texas.

4.      Plaintiff Oren Technologies, LLC ("Oren Technologies") is a Texas limited liability company with a principal place of business at 18515 Aldine Westfield Road, Houston, Texas 77073.  All members of Oren Technologies reside in and are citizens of Texas.

5.      Defendant Grit Energy Solutions, LLC ("Defendant" or "Grit Stack") is a Montana limited liability company with a principal place of business at 120 Candle Lane, Bozeman, Montana 59715.  Upon information and belief, all of Defendant's members reside in and are citizens of Montana. Grit Stack directly infringes both patents in suit.  Defendant may be served with process by its registered agent for service, Kenneth W. Eiden, III, 120 Candle Lane, Bozeman, Montana 59715.

## JURISDICTION AND VENUE

6.      This is an action for infringement of U.S. Patent Nos. 8,827,118 and 8,585,341 arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, as well as for unfair competition and fraud arising under Texas common law.

7.      The Court has subject matter jurisdiction over this action pursuant to 35 U.S.C. § 271, and 28 U.S.C. §§ 1331, 1332 and 1338, as there exists both federal question jurisdiction as well as complete diversity between the parties, and the amount in controversy exceeds $75,000.  Additionally or in the alternative, this Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

8.      The Court has personal jurisdiction over Defendant because Defendant has, either directly or through intermediaries, conducted business in this District by shipping, distributing,

offering for sale, selling, and advertising (including the provision of an interactive web page) its products and services in the State of Texas and/or in this District. Defendant, directly or through intermediaries, has purposefully and voluntarily placed one or more of its infringing products and/or services into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this District.

9.      Defendant Grit Stack has committed acts of patent infringement within this District by, among other things, marketing, selling or offering to sell products and services that infringe the asserted patents in this District. Defendant Grit Stack's infringing products and services were marketed, sold, and/or offered for sale in at least one instance in this District, to Halliburton Energy Services, Inc. ("Halliburton"). The infringing services and products were or are still used at a site operated by the Halliburton, as shown in the video titled "The Grit Stack System – Live Frac" and posted on www.gritstack.com (last visited January 11, 2016), at the 16 second time mark:



10.     Halliburton maintains its United States corporate headquarters in this District at 3000 North Sam Houston Parkway East, Houston, Texas 77032.   Halliburton operates and directs its hydraulic fracturing operations from this headquarters and, consequently, Defendant

3

Grit Stack's infringing services and products were targeted to be offered for sale and demonstrated to and through Halliburton's Houston corporate headquarters.  Accordingly, upon information and belief, Defendant's infringing services and products would have been offered for sale or sold by Defendant to Halliburton within this District.  Defendant's efforts to offer for sale or sell its infringing services and products persist with other potential customers in this District.

11.    Additionally, this Court has personal jurisdiction over Defendant because Defendant, directly or through intermediaries, has committed voluntary acts constituting misrepresentation, fraud, and unfair competition within this District with knowledge that the effect of its tortious activities will be felt by citizens within this District.  Furthermore, or in the alternative, the Court has personal jurisdiction over Defendant under the doctrine of pendent jurisdiction.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in addition to 28 U.S.C. § 1400(b), because Defendant Grit Stack regularly conducts business within this District and/or solicits and establishes direct customer, personal and online relationships with persons and entities within this District in order to market, sell, or offer to sell the infringing products or services alleged herein, and also because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## OREN INGENUITY

13.    Hydraulic fracturing (or "fracking") is a well-stimulation technique in which deep-rock is fractured by injecting high-pressure liquid into a wellbore to create cracks in the rock formations. This technique is often employed by the oil and gas industry to create new channels in the rock, releasing fossil fuels for extraction and increasing ultimate recovery rates

from the reservoir. The development and utilization of this method of recovery for oil and gas over recent years has been exponential.  It has stimulated the economy of this country and this State enormously and, when properly developed, it holds promise of enhancing American energy independence.

14.    Proppant is a solid material, such as sand, that is injected into the wellbore with hydraulic fracturing liquid.  The introduction of proppant is critical, as the solid material holds the fractures open after the injection of fluid ceases and hydraulic pressure is removed from the well. With the width of the fractures held open by proppant, flow and extraction of previously hard-to-reach substances is facilitated through the newly created channels. The efficient, economical, and environmentally sound delivery of proppant to well sites is a crucial component of the well fracturing process.

15.    Typically, any hydraulic fracturing operation requires a large amount of proppant, which poses a significant logistical challenge for oil and gas producers. Without a reliable supply of proppant, the operation risks disruptions in the pump schedule or downtime—either of which would render the operation less efficient and less profitable.

16.    Traditional proppant transportation and storage methods often leads to excessive delays, bottlenecks, and increased costs for a well site's proppant supply. Additionally, these methods create myriad health and safety risks to jobsite workers and nearby communities.

17.    Historically, transportation of proppant from sand mines or storage facilities to the well site employs specialty pneumatic tractor-trailers—a combination of a tractor (or truck) with a power take-off unit and a bulk tank trailer originally designed to haul grains and agricultural products.  Unlike the general freight fleet, these tractor-trailers are far fewer in number and availability and inefficient for the purpose of transporting proppant. Among other challenges, the

process of discharging proppant from a single pneumatic trailer into well site storage can take over an hour.  This time-consuming process—combined with a limited number of compartments in which proppant can be deposited at any given time—leads to serious delays and bottlenecks, as some hydraulic fracturing operations require hundreds of pneumatic truckloads of proppant. Further, once on the well site, the proppant is transferred from large, unwieldy storage bins between multiple pieces of equipment before being injected into the wellbore.  At each transfer point, the proppant is susceptible to loss or contamination, and workers are exposed to health and safety risks from the silica dust expelled into the air.

18.     At least as early as September 2011, John Oren, a co-founder of SandBox, pioneered a proprietary logistics process and containerization solution, which eliminates these, and many other, challenges associated with traditional proppant delivery and storage.

19.     The SandBox solution revolutionized the existing pneumatic proppant delivery methods by employing a modular containerized, gravity-driven proppant delivery and discharge system.

20.     On December 21, 2011, John Oren filed a patent application which resulted in the issuance of U.S. Patent No. 8,827,118 (the "'118 patent").  A true and correct copy of the '118 patent, titled "Proppant Storage Vessel and Assembly Thereof" and issued on September 9, 2014 is attached hereto as Exhibit A and incorporated herein by reference.

21.     John Oren and his son, Joshua Oren, continued to refine the system in order to design a smaller container that could be shipped along roadways.  The result was an embodiment of a modular 10-foot container with a number of advantages over anything then available in the industry.  Among these advantages are the container's ability to be transported by the general

tractor freight fleet without specialty highway permits or escorts and the ability to be unloaded at the well site in a matter of minutes.

22.     This work led to the filing of another U.S. patent application on October 25, 2012, which resulted in the issuance of U.S. Patent Nos. 8,585,341 (the "'341 patent"). A true and correct copy of the '341 patent, titled "Proppant Discharge System and A Container for Use in Such a Proppant Discharge System" and issued on November 19, 2013 is attached hereto as Exhibit B and incorporated herein by reference.  The '341 patent claims priority to and benefit of previously filed applications dated July 23, 2012 and September 27, 2012.

23.     The '118 patent and the '341 patent are duly and lawfully issued United States patents, each of which is valid and enforceable.

## SANDBOX TECHNOLOGY

24.     SandBox Logistics and its parent company, SandBox Enterprises were formed by the Orens to commercialize their newly development technology and inventions. Oren Technologies is the assignee of full title and interest to the asserted patents. SandBox Enterprises is the exclusive licensee to the asserted patents.

25.     During 2012 and 2013, SandBox worked with a number of manufacturers to build its proppant delivery systems, including Bawco Fabricators, Huber Construction, Agrico Sales, Pro Box, One Way Lease, Shanghai Jingsheng Container Manufacturing Co., Ltd, Shannon Welding, and Cambelt International.  SandBox or its representatives entered into non-disclosure agreements with each of these parties in order to safeguard the secrecy of the SandBox proprietary proppant delivery design during this time period.

26.     On April 5, 2013, SandBox's proprietary proppant delivery solution was used for the first time in production by Rock Pile Energy in Williston, North Dakota.

## GRIT STACK LEARNS ABOUT SANDBOX'S PROPRIETARY TECHNOLOGY

27.     Cambelt International ("Cambelt"), headquartered in Salt Lake City, Utah, is the manufacturer of SandBox's proprietary conveyor system—an essential piece of equipment that delivers proppant directly from the SandBox container to the blender where it mixes with hydraulic fracturing fluid.  SandBox contacted Cambelt in May 2012, and SandBox and Cambelt entered into a non-disclosure agreement on June 5, 2012. By June 13, 2012, Cambelt had submitted a proposal to work with SandBox, and the principal of Cambelt visited the SandBox location in Houston on August 3, 2012. The features and utility of the conveyor that ultimately resulted from that proposal appear in the '341 patent.

28.     Shortly thereafter, in or about September/October of 2012—before the first commercial use of SandBox's system—Tim Stefan, one of the founders of Grit Stack, visited Cambelt's offices in Salt Lake City with his wife.  He presented some sketches of a conveyor belt used to deliver proppant in a manner very similar to what Cambelt had been discussing with SandBox Logistics, and then inquired as to whether Cambelt would build such a conveyor for his business. The principal of Cambelt explained to Mr. Stefan that he had a conflict of interest and would be very uncomfortable working with him on a project that was so similar to his ongoing project for SandBox.

29.     At the present time, Plaintiffs are unaware of how Mr. Stefan obtained information on the SandBox process and how he managed to obtain or create a sketch of a crucial component of that process.  Upon information and belief, it is alleged that someone in the industry violated their non-disclosure agreement with SandBox and alerted Mr. Stefan to this revolutionary new process, which Mr. Stefan subsequently attempted to copy.

30.     On May 21–22, 2013, SandBox participated at the 3rd Proppants Summit held at the Sheraton Hotel on John F. Kennedy Boulevard in Houston, Texas. There, SandBox distributed brochures and a video showing the benefits of the various features of its proprietary proppant delivery solution.

31.     John Oren and Joshua Oren made clear to summit attendees that patents were pending on the SandBox proppant delivery solution and that the technology was propriety to SandBox.

32.     While demonstrating the SandBox proppant solution at the Summit, John Oren met Mr. Stefan, who deceptively introduced himself as being affiliated with a sand mining company. As part of SandBox's logistics business includes transporting proppant directly from sand mines, SandBox considered sand mining companies as potential customers—not competitors.

33.     In actuality, Mr. Stefan was the Co-Founder and Vice President of Product Development for Defendant Grit Energy Solutions, LLC.  Grit Energy Solutions, LLC was, and remains, a direct competitor of SandBox.  Mr. Stefan intentionally told Mr. Oren that he was affiliated with "Grit Sand"—a fictional, non-existent sand mining company—even though he knew that he was actually a principal of Grit Energy Solutions, LLC.  Mr. Stefan intentionally made these misrepresentations in order to convince Mr. Oren to share information about SandBox's proprietary proppant solution.  In reliance on Mr. Stefan's misrepresentation, Mr. Oren believed that Mr. Stefan was a sand miner and that Mr. Stefan's interest in the SandBox proppant solution was that of a potential customer's.

34.     Mr. Stefan expressed interest in working with SandBox and expressed interest in taking a tour of one of the nearby wells where the SandBox system was in operation.

35.     Believing Mr. Stefan to be a sand vendor and based on his representations, John Oren showed Mr. Stefan the SandBox proprietary proppant solution in operation on May 23, 2013.   As a standard for all tours and demonstrations at the SandBox facilities, John Oren discussed the proprietary nature of SandBox's equipment and system with all visitors. Additionally, prior to his tour, Mr. Stefan was specifically told that the SandBox proppant solution was proprietary, developed by SandBox with patents pending. The tour, which included an inspection of the SandBox proppant solution's equipment and a live demonstration, took place at a SandBox facility located in at 18515 Aldine Westfield Road, Houston, Texas 77073, not far from the location of the Proppants Summit.   SandBox continues to operate this facility to the current day.

36.     Mr. Oren would not have shown Mr. Stefan SandBox's proprietary solution if he had known that Mr. Stefan was an actual or a potential competitor.

37.     As a direct result of information learned during this demonstration, on April 10, 2014, Mr. Stefan filed a patent application, serial number 14/249,420 (the "'420 application"), in which he falsely claims to be a co-inventor of a system, the features of which were conceived by SandBox.   In addition to Mr. Stefan, the '420 application lists three other named inventors who are officers or otherwise involved in the management of Grit Energy Solutions: Kenneth W. Eiden, III, Mark D'Agostino and Scott D'Agostino.

38.     The fifth individual named as an inventor on the '420 application, Matthew Carley, has been involved in Defendant's business since its formation. Specifically, on April 11, 2013, Mr. Carley registered Defendant's website, www.gritstack.com.   To this day, Mr. Carley remains listed as the point of contact on this website's registration.   Defendant began offering its competing system for sale on its website on August 22, 2014.   Upon information and belief, even

10

prior to his Grit Stack involvement, Mr. Carley has, for the purpose of enabling himself and others to compete with SandBox, improperly acquired, used, and shared proprietary information about the SandBox proppant solution to his contacts and affiliate corporations in the proppant supply and logistics industry.

39.     Under 37 C.F.R. 1.53 and 37 C.F.R. 1.63, in order for the '420 patent to issue with Mr. Carley named as an inventor, he will be required to execute an oath or declaration that he is an original joint inventor of the claimed inventions and that he has disclosed all known information material to the invention's patentability.

40.     Matthew Carley pleaded guilty on December 4, 2014 to conspiracy to commit securities fraud charges in *United States v. Carley*, No. 1:14-cr-333-CMH-1, Docket Entry No. 6 (E.D.V.A. Dec. 4, 2014). After being sentenced on April 3, 2015, he is currently serving a twenty-four month sentence in federal prison.

41.     As a direct result of information learned during the May 22, 2013 demonstration, Defendant markets and sells a proppant delivery system called the GRIT STACK[TM] System which, like the SandBox solution, is a modular containerized, gravity-driven proppant delivery and discharge system meant to eliminate the challenges posed by the traditional pneumatic-based process. Defendant has a federally registered trademark for the GRIT STACK[TM] System. Defendant markets the GRIT STACK[TM] System on its website, www.gritstack.com (last visited January 18, 2016). Defendant further markets the GRIT STACK[TM] System using YouTube videos, available at https://www.youtube.com/user/gritstack (last visited January 11, 2016).

42.     Using the information learned directly from SandBox, Defendant developed its GRIT STACK[TM] System without expending the same time, effort, skill, labor, and money that SandBox expended. Defendant accordingly enjoys a competitive advantage in the market.

43.     On October 14, 2015, SandBox filed with the U.S. Patent and Trademark Office a Petition to Institute Derivation Proceedings pursuant to 35 U.S.C. § 135, which is incorporated herein by reference. The Petition, DER2016-00001, shows that Mr. Stefan and Defendant acquired information used to support the '420 application through misrepresentations and/or false and misleading statements and conduct to SandBox.

44.     Defendant's infringing services and products were marketed, sold, and/or offered for sale in at least one instance, to Halliburton. The infringing services and products were or are still used at a site operated by the Halliburton. Defendant's efforts to offer for sale or sell its infringing services and products persist with other potential customers.

45.     As a result of Defendant's actions, SandBox has been damaged by losing customers, market share, and revenue.  Additionally, Defendant's actions have forced SandBox to expend unnecessary time and resources to institute the derivation proceedings and clear up the ownership in SandBox's proprietary proppant delivery system.  In total, SandBox has been damaged in the amount that exceeds $75,000.

## CLAIMS AND CAUSES OF ACTION

### Count I – Infringement of U.S. Patent No. 8,585,341

46.     SandBox incorporates herein each of the allegations above.

47.     Defendant infringes and/or induces infringement of the '341 patent by making, using, selling, offering for sale, or importing into the United States, or by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more Claims of the '341 patent.

48.     Defendant's products and/or services that infringe the '341 patent include but are not limited to components of the GRIT STACK™ proppant delivery system.

49.     Defendant makes, uses, sells, offers for sale, and/or imports the GRIT STACK™ System and components thereof into this District and elsewhere in the United States.

50.     Defendant's GRIT STACK™ System and components thereof directly infringe— literally and/or under the doctrine of equivalents—at least Claims 1–5 of the '341 patent.

51.     By way of example only, as shown on Defendant's website www.gritstack.com (last visited January 11, 2016), the GRIT STACK™ System infringes upon Claim 1 of the '341 patent in that it includes a container (1) having a bottom (2) and a pair of sidewalls (3) and a pair of end walls (4) and a top (5), said container having an inlet (6) formed at or adjacent to said top, said container having an outlet (7) formed at said bottom:



52.     As shown in the video titled "The Grit Stack System – Live Frac," at 35 second time mark, www.gritstack.com (last visited January 11, 2016), the GRIT STACK™ System also includes a gate (8) slidably affixed at said outlet so as to be horizontally movable between a first position covering said outlet and a second position opening said outlet, said gate having a pin (9) fixedly affixed thereto, said pin extending outwardly of said gate:

13



53.     The same video also shows that the GRIT STACK™ System includes a support structure (10) having a top surface and an actuator (11), said container being removably positioned on said top surface of said support structure, said actuator having a receptacle, said actuator for moving said receptacle horizontally adjacent said top surface of said support structure, said pin of said gate engageable with said receptacle when said container is positioned on said top surface of said support structure, said actuator for moving said gate from said first position to said second position:



54.     Defendant also indirectly infringes the '341 patent as provided in 35 U.S.C. § 271(b) by inducing infringement by others, in this District and elsewhere in the United States. For example, customers and end-users of the GRIT STACK™ System and components thereof directly infringe by using, actively inducing the using, offering for sale, selling and/or importing the inventions claimed in the '341 patent.   Defendant's customers who purchase the GRIT STACK™ System and components thereof and operate the system and components in accordance with Defendant's instructions directly infringe one or more Claims of the '341 patent.

55.     Defendant's infringement of the '341 patent is without license or other authorization.

56.     Defendant's infringement of the '341 patent has damaged and will continue to damage SandBox in the amount to be proven at trial.

57.     Defendant's infringement of the '341 patent has been and continues to be willful. Specifically, Defendant has been on notice of the application that issued as the '341 patent at least since April 10, 2014.   On that date, an Information Disclosure Statement was filed in Defendant's '420 application, which listed the application that issued as the '341 patent.   The '420 application names six total inventors.   Four of the named inventors on the '420 application are or were part of Defendant's management team.   Also, in a letter dated June 3, 2014, the previous owner of the interest in the '341 patent notified Defendant that its system infringes at least Claims 1 and 6 of the '341 patent.

58.     The continuing infringement of the '341 patent by Defendant and those acting in concert with Defendant are causing and will continue to cause irreparable harm to SandBox.

## Count II – Infringement of U.S. Patent No. 8,827,118

59.     SandBox incorporates herein each of the allegations above.

60.     Defendant infringes and/or induces infringement of the '118 patent by making, using, selling, offering for sale, or importing into the United States, or by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more Claims of the '118 patent.

61.     Defendant's products and/or services that infringe the '118 patent include but are not limited to components of the GRIT STACK™ proppant delivery system.

62.     Defendant makes, uses, sells, offers for sale, and/or imports the GRIT STACK™ System and components thereof into this District and elsewhere in the United States.

63.     Defendant's GRIT STACK™ System and components thereof directly infringe— literally and/or under the doctrine of equivalents—at least Claims 1–15 of the '118 patent.

64.     By way of example only, as shown on Defendant's website www.gritstack.com (last visited January 11, 2016), the GRIT STACK™ System infringes upon Claim 1 of the '118 patent in that it includes a container (1) having a first end wall (4) and a second end wall (wall opposite to 4) and a first side wall (3) and a second side wall (wall opposite to 3) and a top wall (5) and a bottom wall (2), said first and second end walls extending between opposite ends of said first and second side walls, said first and second end walls and said first and second side walls and said top and bottom walls defining an interior volume of said container, said first end wall and said second end wall and said first side wall and said second side wall and said top wall and said bottom wall being fixedly and rigidly connected together:



65.     As shown in the video entitled "The Grit Stack System – Live Frac," at 35 second time mark, www.gritstack.com (last visited January 11, 2016), the GRIT STACK™ System also includes a bottom hatch (6) formed generally centrally on said bottom wall of said container, said bottom hatch swingably movable between an open position and a closed position, said hatch extending transverse to said bottom wall when in said open position:



17

66.     The GRIT STACK™ System includes first through fourth inclined surfaces, as well as first and second support members, as recited in Claim 1 of the '118 patent, as shown in the photographs below:



67.     With respect to Claim 7 of the '118 patent, the containers (1) of the GRIT STACK™ System are stackable such that a first container can be supported in spaced relation above a second container in a manner that meets every limitation of Claim 7.  Upon information and belief, the containers of the GRIT STACK™ System have a top opening and a bottom hatch that are aligned when one container is stacked on top of another container.



68.    Defendant also indirectly infringes the '118 patent as provided in 35 U.S.C. § 271(b) by inducing infringement by others, in this District and elsewhere in the United States. For example, customers and end-users of the GRIT STACK™ System and components thereof directly infringe by using, actively inducing the using, offering for sale, selling and/or importing the inventions claimed in the '118 patent. Defendant's customers who purchase the GRIT STACK™ System and components thereof and operate the system and components in accordance with Defendant's instructions directly infringe one or more Claims of the '118 patent.

69.    Defendant's infringement of the '118 patent is without license or other authorization.

70.    Defendant's infringement of the '118 patent has been and continues to be willful. Specifically, Defendant has been on notice of the application that issued as the '118 patent at least since April 10, 2014. On that date, an Information Disclosure Statement was filed in Defendant's '420 application, which listed the application that issued as the '118 patent. The

'420 application names six total inventors.  Four of the named inventors on the '420 application are or were part of Defendant's management team.  Also, in a letter dated July 17, 2014, the previous owner of the interest in the '118 patent notified Defendant of the U.S. Patent Publication of the application that would soon issue as the '118 patent.

71.    Defendant's continued infringement of the '118 patent has damaged and will continue to damage SandBox in the amount to be proven at trial.

72.    The continuing infringement of the '118 patent by Defendant and those acting in concert with Defendant are causing and will continue to cause irreparable harm to SandBox.

**Count III – Unfair Competition by Misappropriation**

73.    SandBox incorporates herein each of the allegations above.

74.    SandBox created its proprietary proppant delivery system through extensive time, effort, labor, skill, and money.  John Oren and Joshua Oren expended hundreds of hours over the course of several years to conceive, reduce to practice, and actualize the inventions embodied in SandBox's proppant solution.  This work included not just making the initial design, but working with engineers, manufacturers, and lawyers to obtain patents to various aspects of the solution.

75.    Having gained access to a demonstration of SandBox's solution through misrepresentation, Defendant was able to file its own patent application without having to expend the same time, labor, skill, money, and effort that SandBox did.

76.    Because Defendant is not burdened with the expense incurred by SandBox, Defendant enjoys a competitive advantage in marketing its product.

77.    Defendant markets and sells its competing product in direct competition to SandBox.  SandBox has been commercially damaged as a result by losing customers, market share, and revenue.

78.     Also, SandBox has been damaged by having to remedy the perception in the marketplace that Defendant's competing solution is entitled to patent protection when, in fact, the invention that Defendant claims as its own belongs to SandBox.

79.     Defendant's unfair competition by misappropriation has damaged and will continue to damage SandBox in the amount to be proven at trial.

### Count IV – Fraud

80.     SandBox incorporates herein each of the allegations above.

81.     John Oren met Tim Stefan at the Proppants Summit held on May 21–22, 2013 in Houston, Texas.

82.     At the time of the Proppants Summit, Mr. Stefan was a principal of Defendant Grit Energy Solutions, LLC.

83.     Defendant is a direct competitor of SandBox.

84.     Knowing that he was in fact a principal of Grit Energy Solutions, LLC, Mr. Stefan told Mr. Oren that he was affiliated with a fictional "Grit Sand."  Mr. Stefan further represented to Mr. Oren that he wanted to work together with SandBox.

85.     Mr. Stefan made these misrepresentations with the intent to convince Mr. Oren that Defendant was involved in sand mining, and not in competition to SandBox.  Mr. Stefan further had the intent to convince Mr. Oren to share information about SandBox's proprietary proppant delivery solution with Defendant.

86.     In reliance on Mr. Stefan's misrepresentations, Mr. Oren believed that Defendant was engaged in sand mining and, in further reliance on Mr. Stefan's misrepresentations, Mr. Oren agreed to show him SandBox's equipment and facilities.  Mr. Oren would not have agreed to share information about SandBox's solution with Mr. Stefan or show him SandBox's

equipment and facilities if he had known that Mr. Stefan was the principal of SandBox's direct competitor.

87.    Having gained access to a demonstration of SandBox's solution through misrepresentation, Defendant was able to file its own patent application without having to expend the same time, labor, skill, money, and effort that SandBox did.

88.    Because Defendant is not burdened with the expense incurred by SandBox, Defendant enjoys a competitive advantage in marketing its product.

89.    Defendant markets and sells its competing product in direct competition with SandBox.   SandBox has been commercially damaged as a result by losing customers, market share, and revenue.

90.    Also, SandBox has been damaged by having to remedy the perception in the marketplace that Defendant's competing solution is entitled to patent protection when, in fact, the invention that Defendant claims as its own belongs to SandBox.

91.    Defendant's actions have damaged and will continue to damage SandBox in the amount greater than $75,000.00 and to be proven at trial.

## **DEMAND FOR JURY TRIAL**

SandBox respectfully requests a jury trial on any issues so triable by right.

## **PRAYER FOR RELIEF**

WHEREFORE, SandBox respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.  A judgment that Defendant infringes the '341 and '118 patents;

B.  A judgment and order requiring Defendant to pay SandBox damages in an amount adequate to compensate SandBox for Defendant's infringement of the '341 and '118 patents, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

C.  A judgment that Defendant's infringement of the '341 and '118 patents was and continues to be willful;

D.  A judgment and order requiring Defendant to pay SandBox the pre-judgment and post-judgment interest to the fullest extent allowed under the law, as well as its costs;

E.  An injunction enjoining Defendant, and all others in active concert with Defendant, from infringement of the '341 and '118 patents;

F.  An order finding that this is an exceptional case and awarding SandBox its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.  A judgment that Defendant has engaged in unfair competition by misappropriating SandBox's proprietary proppant delivery system;

H.  A judgment and order requiring Defendant to pay SandBox damages in an amount adequate to compensate SandBox for Defendant's unfair competition by misappropriation;

I.  A judgment that Defendant has engaged in fraud;

J.  A judgment and order requiring Defendant to pay SandBox damages in an amount adequate to compensate SandBox for Defendant's fraud;

K.  An order awarding SandBox its costs and fees; and

L.  Such other relief as the Court may deem appropriate and just under the circumstances.

Respectfully submitted,

SANDBOX LOGISTIC, LLC, SANDBOX
ENTERPRISES, LLC, AND OREN
TECHNOLOGIES, LLC

By its Attorneys,

HOGAN LOVELLS US LLP

/s/ Bruce D. Oakley
Bruce D. Oakley
Texas Bar No. 15156900
Southern District No. 11824
700 Louisiana Street, Suite 4300
Houston, Texas 77002
Tel:    (713) 632-1400
Fax:    (713) 632-1401
Email: bruce.oakley@hoganlovells.com

ATTORNEY-IN-CHARGE FOR PLAINTIFFS
SANDBOX LOGISTIC, LLC, SANDBOX
ENTERPRISES, LLC, AND OREN
TECHNOLOGIES, LLC

**Of Counsel:**

Jeffrey S. Whittle
Texas Bar No. 24037813
Southern District No. 991796
Heaven C. Chee
Texas Bar No. 24087290
Southern District No. 2383177
HOGAN LOVELLS US LLP
700 Louisiana Street, Suite 4300
Houston, Texas 77002
Tel:    (713) 632-1400
Fax:    (713) 632-1401
Email: jeffrey.whittle@hoganlovells.com
Email: heaven.chee@hoganlovells.com

Srecko Vidmar
(*Pro Hac Vice Motion Pending*)
Colorado Bar No. 34921
HOGAN LOVELLS US LLP
One Taber Center, Suite 1500

24

1200 Seventeenth Street
Denver, Colorado 80202
Tel:     (303) 899-7328
Fax:     (303) 899-7333
Email: lucky.vidmar@hoganlovells.com

Arnold A. Vickery
(*Pro Hac Vice Motion Pending*)
Texas Bar No. 20571800
SANDBOX LOGISTICS, LLP
3200 Southwest Freeway, Suite 1310
Houston, Texas 77027
Tel:     (281) 949-8400
Email: avickery@sandboxlogistics.com